Good afternoon and may it please the court. I would like to, before I get started, just reserve four minutes of my time for rebuttal. All right. Try to keep track of your own time, please. Yes, I will. The case for standing here is very clear, as the facts presented in this matter are nearly identical to those in Hawk v. Advanced Micro Devices, which this court decided earlier this year. We cited to the district court decision in our briefing while the appeal was pending. Are they? Are they? In Hawk, the plaintiffs said, my device crashed when I put on the patch. And the plaintiffs said we had personal degradation of our devices. They may be, you may have standing here, I'm not saying you don't, but how is this identical to Hawk? Well, in several ways. First is that both cases arise out of allegations that the plaintiffs had purchased processors manufactured by the defendants that contained a defect in the way they implemented certain... Right, but the district court in Hawk, Judge Koh, said, and the MemDisc, which is not binding on us in this court, said, stressed the fact that the plaintiff's devices, in effect, failed or had terrible problems once the patches were put on. You don't make any such allegations. So I don't know how Hawk helps you on the issue of standing. Well, we make allegations as the plaintiffs did in Hawk that there was a reduction in performance once the patches were applied. Not of the plaintiff's devices. What you allege is that you tested one device and therefore one can infer universally a degradation in performance. But you made no allegation that any device owned by any of the plaintiffs had any degradation in performance. I personally experienced any degradation in performance. Am I right? Well, what we alleged was that plaintiffs applied the patches and that the patches, as applied by nature of how they operate in disabling certain performance enhancing features that were the root of the defect, would necessarily have slowed down. Now, we didn't test the plaintiff's devices. You're right in that to provide examples of how those mitigations would have impacted plaintiff's devices, we tested the same model device that plaintiffs had. Tested one iPhone. Tested one iPhone. Correct. And that iPhone was the same model iPhone that plaintiffs Giraldi and Olsen used. And that testing. Look, I don't want to get you too far off track. I just don't think Hawk is particularly helpful to you. The question is whether or not the test you did is sufficient to give rise to a plausible allegation that your devices were degraded in performance. In Hawk, there was no need for any such implication because the individuals said their devices were degraded in performance. Why was the test on that one device sufficient to give rise to a plausible allegation that your devices were degraded in performance? Sure. It's just to clarify. It was not just the testing on that one device. The testing on that device supplemented other allegations in the complaint about testing from numerous sources, including testing that Apple conducted that showed that devices applying the mitigations experienced as much as a 2.5% slowdown. By allegations that testing conducted by third parties showed that devices applying the same mitigations experienced as much as a 50% slowdown. And the testing that we conducted on the same model iPhone 7 was supplemental to show that that device would have experienced the kind of slowdown when those patches were applied. Now, the reason it's important and that those testing results are relevant to plaintiff standing is because of the way the mitigations operate. What we're alleging are patches that are computer programs that run on devices made in a standardized way. And so when the patches are applied to computer processors and disable a performance enhancing feature that runs the same... So is your argument then with regard to the performance degradation theory is that because it's a design defect, the performance degradation caused by the patch really isn't device specific. And that's why it goes across all different devices. Is that the argument and the pleading allegation that you're relying on for that theory? So I think that's correct. The allegation is that the defect in the way that speculative execution and certain enhancements are implemented is constant throughout the devices. And so when the mitigation patch comes out that attempts to address that issue by disabling those features, that the performance reduction is going to occur across all devices that implement that same feature and deploy the same patch. And so as the plaintiff standing specifically though, the iPhone 7 testing was merely to show that the same type of device that they had would also respond in an adverse way to the patches being applied. The test results that generally showed that the application of the patches would cause slowdowns for the reason we talked about, because it would disable a performance enhancing feature, that applies across the board. Now as to the allegation that plaintiffs noticed the slowdown or whether they noticed it, I think it's important to highlight that subjective notice, as opposed to what we allege, which is that the devices themselves actually slow down is not a requirement to plead a particularized harm. What particularization is testing is whether or not the claim at issue is implicating plaintiff's rights. In other words, if plaintiff's allegations are correct and the patch applied caused their phones to slow down because it disabled these performance enhancing features as needed to mitigate against the defective design of Apple's processors, would that be a claim that implicates their own rights that they could press as opposed to somebody else's rights, like those of a third party? And the briefing recited multiple cases where there are examples throughout that subjective notice, noticing that you suffered the injury that there would have been. I don't think anybody's claiming subjective notice is important. The difficulty is that none of your clients allege a degradation in performance of their phones. They allege that they must have been degraded in performance because of this testing and because of the universality of the hardware and software. Is that fair? Well, not exactly. They do allege that their phones, by nature of the mitigation efforts, are slower. And it's in the same way, for example, they don't really allege that their phones are slower. They allege their phones must be slower because these other things. I mean, the difference between this and how that's why I keep going back to it is how somebody said, hey, I had problems with my phone or problems with my computer. After the patch, your individual plaintiffs don't allege any problems that they experienced, do they? Well, they are problems that they would have experienced by nature of the defects. OK, let's let's try this again. We don't have to joust with each other. Your individual plaintiffs don't say I had a problem with my phone because of the defect. They say my phone must have been degraded in performance because of the defects, because of all these other things that I'm alleging. Is that fair? Yes, because the patch was designed to disable a feature that would have caused it to slow down. And that's the same. I say that's the same type of your argument is that you've got a universal injury here because of the nature of things. The patch must have slowed down everything to which it was applied. Is that is that your argument? By virtue of how it was designed and applied, that all devices that applied the patch would have slowed down. That is correct. And that our plaintiffs. How do we know that that slowing down was material in any way? Well, it's material. It is material in a sense that it disables a central feature of the device itself. It's disabling performance enhancements. And we have testing reported from third parties and our own testing that shows a significant reduction in performance. In fact, really, any amount of performance reduction is going to be sufficient. Thank you. That's the real question I was asking. Is your view that even a one tenth of one percent degradation in performance would be sufficient? At this stage, yes, it would. That that a reduction in performance that is caused by disabling a central feature of it is like a performance enhancing feature like speculative execution is going to be a material reduction that gives rise to an injury in fact. And it's the same way that does your whatever it was, testing or algorithmic calculations or whatever you which leads you to the conclusion that there was a slowdown. Does it do anything to eliminate other possible causes of the slowdown? Or so it just assumes that the slowdown was caused by these patches. Well, the slowdown is is plausibly caused by the patches because we know the patches were designed to disable features that increase performance. In other words, the defect here arises from the implementation. No, no, no, no, no, no. But does your proof eliminate other possible sources of the slowdown? Well, we conduct before and after testing based on the activity of the phone before the patches are applied and after the patches are applied. And so based on those allegations, it's plausible that the patch being applied is responsible for the slowdown. There may be other causes, but at this stage of the litigation, we're not required to rule out all alternative potential causes of the slowdown. Moving on though, the performance reduction is not just the only injury in fact that we allege. We also allege that we suffered economic harm once information about the defects was disclosed to the market as the market reacted to the correction of Apple's omission and failing to disclose the defective nature of its processors to customers. And we supported these allegations of economic harm, both in the form of a reduction in value of the devices and an overpayment at the time plaintiffs purchased their devices with empirical analysis of market pricing for the specific model. I understand your reduction in value argument and I want to ask your friend about this, but I don't understand your overpayment argument. These were not devices that you could bargain for. Apple was selling them for a price. It wasn't like you could have said to them at the time, hey, I've discovered they've got a problem and I'd like to pay you half as much. You bought the device, perhaps it was defective and perhaps you have a claim for that, but I don't understand your overpayment argument. Could you explain it? Well, sure. Well, the reason is that consumers have a choice in what they buy and they would not have been willing to pay the same amount had they known that these devices were defective. But the overpayment theory also depends on the fact that this device was subject to these two malware things, right? Isn't that what caused the overpayment? But that was undisclosed at the time plaintiffs purchased it. Well, at the time they purchased it, nobody had detected the malware intrusion yet, right? It was not known to anybody. That's not what we allege. So our allegations are that Apple knew about the defects and concealed them much earlier. Before the plaintiffs bought their devices? Yes. At least as early as 2012, we cite examples where Apple made changes to the underlying operating system that are consistent with changes that would mitigate these defects and that information about this was available to Apple. So your theory on the case is that Apple knew that its devices, say, you know, iPhone 7 and onward, were subject to attack by these malware devices as early as 2012 and kept that hidden? Is that the theory of that overpayment? That they knew that the performance enhancing features were implemented in a way that gave rise to a risk of cybersecurity attacks, whether it was those specific attacks. What we do allege is that they began making changes to the operating system in 2012 to address the same issues that end up being identified later by third party researchers at Google. And what we're alleging is that Apple actually knew about that before it was disclosed to them by researchers at Google. I'm sorry, on your overpayment theory, I'm still stuck with the problem that it seems uncontested that everybody's devices suffered from the same vulnerabilities, correct? Not everybody in general, no. So the different processors manufactured by companies. Think about iPhone 7. Could you have bought a smartphone from anybody at the time you bought this smartphone that didn't suffer from the same vulnerability? Yes, and you can buy phones that have different processors that implement... I'm asking, at the time, was there any, at the time that your clients bought these phones, was there any product, smartphone product on the market that did not suffer from the same vulnerabilities? The Google report seems to say everybody suffered from the same vulnerabilities. Well, just if I can clarify that. No, no, you can just answer it, and then you can clarify it. Was there an alternative product on the market that didn't suffer from the same vulnerabilities? So the vulnerability itself is manifested in different ways. The Meltdown and Spectre attacks that you're referring to come in different versions. Some processors are not subject to Meltdown, some are subject to Spectre. And so while there is a general umbrella category of issues that do apply to all modern processors, it's actually a little bit more subtle than that. For example, the processors in Hawk is susceptible to Spectre attacks, even though Apple's processors here are subject to Meltdown and Spectre attacks, and other processors might be suspect to other types of attacks. They all implement certain performance handling features incorrectly. Yeah, but just to focus on, every processor on the market in a smartphone at the time that your clients bought these iPhones was subject to either, to one of the two vulnerabilities, either Spectre or whatever the other one is, right? I don't know that that's true, because there are processors. That's what the Google report says that you rely on, so it seems to me it's processors that do not use the same performance and handling. So there are processors that would not be susceptible to these attacks. I don't know. Maybe processors where there's smartphones available on the market at the time that were not subject to these vulnerabilities. It's possible. So the answer is you don't know one way or the other? Is that the answer? I'm not clear on what your answer to Judge Hurwitz's question was. Yes, I know that there are processors that are not subject to those defects, but I think the question that I'm having difficulty answering is whether or not every smartphone on the market necessarily used the processor that was defective. I think what we allege in the complaint is that there are different processors used by different phone manufacturers that had different versions, were subject to different versions of the attacks. Okay. We've taken you over your time, so let's hear from opposing counsel. Ms. Blunshee, am I pronouncing that correctly? Yes, actually. Very nice. Thank you. Melanie Blunshee on behalf of Apple. Thank you, Your Honor. I'd like to start with two quick clarifications of the pleadings. One, with respect to the existence of these defects in other smartphones, the complaint does not plead that there were other alternative smartphones that did not suffer spectrum meltdown. And to address the question about the AM processors in Hawk, those were for computers, not for the sorts of mobile devices that are at issue here, which are smartphones, tablets, music players, and Apple TVs. Second, I'd like to clarify that we heard a lot about these patches disabling a feature, disabling speculative execution. That is also not pled and not consistent with the facts. What is pled is that the patches adjusted the way the device could access information in the kernel and shield it. But there's no allegation that speculative execution was disabled in a way that necessarily slowed down the phone. And following those two clarifications, I'd like to explain the plaintiffs have not met their burden on standing. Not only have they not alleged a concrete injury to a legally protected interest, they have not alleged an injury that is fairly traceable to the alleged misconduct. There's no dispute that these two security vulnerabilities were never exploited. No one was hacked. And the vulnerabilities were patched at roughly the same time they became public. So there's no ongoing threat. Well, they allege a regression analysis that supports a diminution in value theory. It's not uncommon to have regression analysis. And I think part of the struggle I have with this case is that we're talking about Article 3 standing and not the merits. That's a whole separate analysis. And there may be weaknesses there for the plaintiff's case. But for purposes of Article 3 standing to say regression analysis, albeit subject to vigorous attacks by your side, it is a legitimate theory and commonly used theory to show diminution in value. So why doesn't that in and of itself sufficient to establish Article 3 standing? So the regression analysis is indeed common. It can be used when properly led to set forth an injury in fact. But that doesn't relieve plaintiffs of showing that that injury in fact is to a legally protected interest and fairly traceable to the alleged misconduct. And so here we have to look at what the statements are that Apple made. As the district court observed, there was nothing in the record showing that any of these devices failed to meet a benchmark of speed or performance or safety that was promised. In fact, there's evidence in the record that Apple warned that there would be device updates that those could impair the ability of the devices to use specific features. And that all devices are susceptible to novel security issues, but that Apple doesn't disclose, discuss, or confirm security issues until an investigation has occurred or patches releases are available. Aren't those 12B6 issues? Aren't those merits issues? And you may have, we don't know. The district court never addressed the 12B6 arguments, and you might be entitled to win on 12B6. But here, and I'll go back to what Judge Winn had said, the allegation seems to be you didn't tell us that the devices had these vulnerabilities. Whether you were required to or not, put aside for a second, because that's a 12B6 issue, I think. You didn't tell us. And when the marketplace found out that they had the vulnerabilities and found out that the patches may or may not have affected performance in some way that may or may not be material, the value of our devices went down. So I owned a device on day one that was worth $200, and then day two it was worth $175. And the regression analysis shows that the cause of that must have been the announcement by Apple of the problems and the subsequent fixing. I think that's fair that that's what they allege. Why isn't that enough at the 12B1 stage to show injury in fact? The Maya decision is very illuminating on this, because it talks about the difference between the 12B6 standard and the 12B1 standard, and acknowledges that even under the standing case law, the court still has an obligation to look at whether the causal connection between the alleged wrong and the alleged economic injury is plausible, or whether it is too tenuous to support standing. On that front, and again, we're at the 12B1 stage. We don't have the regression analysis. For all I know, somebody did it on the back of a napkin, and it's a terrible analysis, but we have to accept their allegations about it at the moment. They say the analysis accounted for all other factors that might have affected price. And what follows out, we were left with this notion that the announcement must have affected price. Now, the announcement may not have been actionable. You may have done nothing wrong, but that's their theory of the case. So, why isn't it linked to what they say you did wrong? Because the underlying harm is too speculative to support an economic injury. So, under Birdsong and KVN and other case law of the circuit, where the underlying harm, be it a potential physical injury or hacking, as in KVN, is too speculative by itself. Here, the underlying harm alleged is that my device, which I guess I could have sold on eBay for some amount. I didn't know about that until I read this case. It turned out that the next day, I couldn't sell it on eBay for that amount. I could sell it for some number less. So, why isn't the diminution in value of the device, not its potential to being hacked or it's slowing down, why isn't that a concrete injury? So, both Birdsong and KVN are very helpful here, because you have to be able to tether that economic injury to something that's actionable. Some sort of invasion of a legally protected interest, whether that's a vested interest in operating with a certain speed or security, or some sort of robust resale market that should be established and tethered to the alleged false statement. Other than the district court in this case, where would I look to find authority for the notion that the resale market had to be robust or well-established? I think KVN is illustrative on that point. KVN notes the absence of a resale market in that, or sorry, the absence of allegations of an impact in a resale market. Winkset is also illustrative. It talks about the sort of situation where you might have a vested interest in being able to resell a device. In that case, the court says the possibility of resale doesn't eliminate an injury, but it speaks to the sort of circumstances where you would actually consider market impacts as a possible injury. Separately, this court's guidance in San Diego County versus Reno cautions that when you're looking at market impacts and market-based injuries, that can be very amorphous. It is very important to make sure that you have the robust indicia that the injury that's alleged was actually caused by the alleged misconduct. That remains absent here. Am I wrong? I don't see that in KVN. I see the theory about overpaying in KVN. Another MemDisc, by the way. I see the theory about vulnerability to hacking, but was there any evidence in KVN that the vehicles were worth less as a Kelley Blue Book matter afterwards? There wasn't. The court pointed to that absence. In contrast, in Toyota, we had evidence that the Kelley Blue Book value had gone down and said that can establish an injury in fact. We don't know intuitively that people sell these 75,000 transactions that they looked at and analyzed. Why isn't that enough at the 12B1 stage to establish a plausible allegation of concrete injury? Even if they establish a concrete injury, they still have to meet the second prong of the book. They still have to show that that injury is fairly traceable to the alleged misstatements here. When we circle back to what statements Apple was making, the statements about performance are that each generation of processor, there's 12 generations here, was relatively faster than the next. The statements about security are that we design with security in mind. There are plenty of warnings about device updates and the fact that we don't reveal security vulnerabilities until they're patched. At the outset, it's very challenging to tether any harm to those statements. But beyond that, when we look at Birdsong, when we look at Kingham, we see there's a hypothetical injury. You can't turn a hypothetical injury into an economic injury. Here, actually, we don't even have a hypothetical injury because the devices were patched and there was no longer risk of patching. So you can't take an injury that by itself is no longer adequate and say, you know, we asked a bunch of people how much they sold their iPhone for, and now it's an economic injury. That caused a link under Birdsong and Kingham fails. And beyond that, you know, as the courts noted before, you know, this was a defect that affected all of the smartphones in the market and kind of did not give us enough in their pleading to tell whether there was a relatively greater impact on Apple's iPhones versus the other iPhones. Anything further, counsel? If the court doesn't have any further questions, I just know that we do believe that this decision should be affirmed, including because plaintiffs cannot allege that they personally suffered the injury. They cannot allege that there was a legally protected interest in a certain level of speed or a certain resale value, and they cannot allege that the injury is fairly traceable to the alleged misstatements at issue, especially with a class this incredibly broad, which covers 10 years, which covers 14 different kinds of smartphones, many different kinds of iPad tablets, many different kinds of iPod music players, even Apple TVs. Are we only looking at this stage at the claims of the individual plaintiffs? We are looking at the claims of the individual plaintiffs, but in the ninth circuit, it may be that this is not a certifiable class. It may be there may be all kinds of problems. The only question we have right now is whether the individual plaintiffs have a claim, correct? That is the primary question, but we also look at whether the other products are sufficiently similar to be one. Well, see, I don't think we do at this stage. None of these plaintiffs claim that a product that they were injured by something with respect to a product they didn't buy. We can only analyze the products they bought, correct? Sure, and they bought a very small handful of the products that are in this class. What we sort of routinely see that Judge Koh, for example, in Grace versus Apple or Judge Shannon Byer versus Symantec, they do conduct at least an initial analysis of whether there's sufficient similarity among the products that are in the class. And here, the plaintiffs are the master of the class they plead, and this is an extraordinarily broad and diverse one. All right, thank you very much, counsel. I think our questioning ate up all of your time, but I'll put a minute on the clock for rebuttal if you have anything additional to add, counsel. Yes, very briefly, I just want to address and make clear that we are not seeking or alleging injury based on the theoretical risk of harm. The injury we're alleging that is being represented by the regression analysis comes from the disclosure of omitted information. It's the response and the demonstrable impact on the market that this regression picks up once Apple's omissions are corrected, when news of the defects are disclosed. That is what the regression demonstrates and why we have sufficiently pled an injury in fact. It is not these other statements like representations or statements about speed or about the types of processors, but really the omission being corrected itself that the regression is looking at. That CAHEN might make reference to certain types of injuries that are sufficient are just examples. Pleading a regression is sufficient here. I will note just that in CAHEN and Birdsong, none of the plaintiffs, and this is different from this case, reported to allege any evidence that the value of their products had reduced in value at all. It was simply made a bald allegation that their products had decreased in value. The inclusion of allegations here showing that there is a demonstrable effect on the market is exactly what CAHEN recognizes as being sufficient and exactly what we allege. All right. Thank you, counsel, unless the other judges have any questions. Judge Horowitz? Judge Tsushima? I do not. Thank you to both sides for your argument. The matter is submitted for decision by the court.
judges: Tashima, Nguyen, Hurwitz